**Larry Gordon MALOY, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–75–295.**

Court of Criminal Appeals of Oklahoma.

Dec. 18, 1975.

George Briggs, Shoemake & Briggs, Pawhuska, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., Harold T. Garvin, Jr., Legal Intern, for appellee.

## OPINION

BLISS, Judge.

The appellant, Larry Gordon Maloy, hereinafter referred to as defendant, was charged in the District Court of Washington County, Case No. CRF–74–124 with the crime of Assault and Battery with Intent to Kill. After a lengthy trial, the jury returned a verdict of guilty of the lesser included offense of Assault and Battery with a Dangerous Weapon. Punishment was assessed at a term of five (5) years in the custody of the Oklahoma State Department of Corrections. From a judgment and sentence in conformance with the verdict the defendant has perfected his timely appeal.

Briefly stated the evidence adduced at trial is as follows: Lynda Lee Alspach testified that on the evening of March 7, 1974, while she and the defendant were still married but in the process of obtaining a divorce, the defendant called to say that he was coming up to her apartment to visit their little girl. The witness told him that she was not there and that he was not welcome. The defendant said he was coming up anyway. She then called the Dewey Police and got her mother's .22 pistol. When the defendant arrived Lynda told him to leave and he proceeded to break

down the door. The witness reached for the gun and "snapped it" at the defendant knowing that there was no bullet in the chamber. The defendant took the gun, began slapping the witness and then turned on Don Smith, an acquaintance of Lynda's who happened to be visiting. After a brief altercation Smith left. The defendant then proceeded to hit the witness with his fists, knocking her to the floor. She then realized he was reaching in a silverware drawer and then stabbing her with a knife. She did not lose consciousness and recalled him stating that he intended to kill her and then taking the gun, placing it to her head and firing. The witness further testified that she received 29 stab wounds and a bullet wound to the head. Medical testimony was then offered concerning the nature and extent of Mrs. Alspach's wounds.

Donald Foster Smith testified that he had known Lynda Maloy for a short period and was visiting her when the defendant called and subsequently burst in through the door. He first attempted to help Lynda but after seeing he was no match for the defendant he left in hopes of finding help. Smith testified that after the defendant broke down the door he went directly for Lynda and began hitting her about the head with his fists. A Dewey Police Officer then testified that when he arrived at the scene the defendant was standing outside the apartment and made the voluntary statement "I've killed her and I think she's dead."

Jess Anderson, the occupant of the apartment next to Lynda's, then testified that on the evening in question he was at home listening to police calls on the radio when he heard a report of a disturbance at his address. He then heard a door being kicked in and looked out into the hall in time to see Don Smith run out of Lynda's apartment. While attempting to catch Smith, whom he thought to be the culprit, he heard a gun fire and screaming coming from the apartment. He subsequently saw the defendant with blood all over his hands and heard him mumble "I think I've killed her." On cross-examination Anderson stated he thought he heard two or three shots.

The defendant took the stand to testify on his own behalf stating that on the evening in question he went to Lynda's apartment with the sole intent of visiting his five year old daughter, although he had been told by Lynda on the phone that he could not see her. When he arrived at the apartment he was refused admittance, stood in the hall for a moment and then knocked in the door. with his shoulder. When he entered Lynda began to scream and he slapped her. He then attended to Smith who immediately left the apartment. As the defendant turned around Lynda pulled a gun from her purse and fired. The defendant tried to disarm her and in the struggle other shots were fired. The defendant was proceeding to leave but turned around to find Lynda screaming and holding a knife. He then stated he went "berserk" and described what followed:

"I remember grabbing the knife. And I remember—I wasn't thinking about—my mind was just, it just—What I remember is the part that just looked like, it felt like me standing off and somebody else—watching somebody else stab somebody."

The defense subsequently called Dr. Moorman Prosser, a medical doctor specializing in neuropsychiatry. Dr. Prosser testified that he had examined the defendant, given him numerous tests and was of the professional opinion that at the time of the incident the defendant suffered an "overwhelming emotional suppression of intellectual processes." He further described the defendant as an individual of borderline stability.

On rebuttal Dr. Rustico Garcia, Chief Forensic Psychiatrist, Eastern State Hospital, Vinita, testified that on April 25th, 1974, the defendant was admitted to Eastern State Hospital for sixty days observa-

tion. After observation and testing, Garcia formulated a diagnosis of passive-aggressive personality with emotional immaturity. Garcia stated that such a diagnosis did not indicate insanity. It was Garcia's opinion that the defendant knew right from wrong and was able to assist in his own defense. He further stated it was his opinion that the defendant's failure to obtain permission to see his daughter did not cause a psychotic episode.

■ The defendant's first assignment of error urges that the defendant's right to due process of law was infringed by the trial court's refusal to allow him to testify as to his intent at the time of the alleged commission of the offense. The defendant's brief reveals no citation of authority in support of his assignment. This Court has held on many occasions that it is necessary for defense counsel not only to assert error, but also to support his contention by both argument and citations of authority, and if that is not done, and it is apparent that the defendant has been deprived of no fundamental right, this Court will not search books for authorities to support mere assertions that the trial court erred. *McGee v. State*, Okl.Cr., 402 P.2d 921 and *Battle v. State*, Okl.Cr., 478 P.2d 1005.

The incident complained of appears in the record as follows, to wit:

Q. Now, can you tell us, please, did you go up there and did you go into that apartment with any intention at all to harm—

MR. BOONE: We're going to object to that, your Honor.

THE COURT: Sustained.

Q. When you went into the apartment did you have any intention of harming Lynda in any way?

THE COURT: Sustained. That's the same question you just asked.

MR. BOONE: And the same objection.

THE COURT: It's leading.

MR. BRIGGS: Excuse me?

THE COURT: It's a leading question. You are not cross examining now. This is your witness.

MR. BRIGGS: I know. I understand that, your Honor, May I ask him what his intention was when he went there and when he went in?

MR. BOONE: Objection. I think it is a subjective type thing, your Honor, and not subject to proof in this manner.

MR. BRIGGS: If your Honor please, it's the only way I can present testimony and proof of his intention is to ask the man himself his intentions. And we think it is an appropriate way—

THE COURT: Overruled. He may answer.

Q. You may answer what your intentions were when you went up to the apartment and when you went in.

A. My intentions were whenever I went up to the apartment was to see Colbie. And whenever I went in my intentions were to see Colbie.

Q. At any time did you have any intention of doing bodily harm to Lynda?

A. No.

THE COURT: That's the same questions that's been objected to three times before, Mr. Briggs.

From the above it is evident that the jury knew full well that it was the defendant's position that he had no intent of harming Lynda when he went up to the apartment. The record does not reflect that the answer to the last question was

stricken or that the jury was admonished to disregard same. Although there may have been technical error on the part of the trial court, it is the opinion of this Court that such error would be harmless in the instant case. The defendant's first assignment of error is without merit.

■ The defendant's last assignment of error urges that due process was denied him by the trial court's refusal to require the production of psychiatric and diagnostic records and reports which were in the possession of Dr. Garcia when he testified as a rebuttal witness. Again the defendant fails to cite any authority in support of his mere assertion of error. See *McGee v. State*, above.

An examination of the record of the trial indicates that the trial court refused to allow defense counsel to see the medical records in the possession of Dr. Garcia. The failure to allow counsel to examine the defendant's medical records arising out of his admission to Eastern State Hospital was error. However, under the particular facts of the instant case it is our opinion that the error deprived defendant of no fundamental right. The purpose for sending the defendant to Eastern State Hospital was to determine if he knew the difference between right and wrong and could assist in his own defense while the defendant's apparent defense was one of temporary insanity at the time of the commission of the crime. The record indicates that the reports would have shed little light on the defendant's sanity at the time of the commission of the crime. The defendant's last assignment of error is without merit.

After an examination of the record as a whole, it is apparent to this Court that no fundamental right of the defendant was prejudiced, that no citation of authority was presented to the Court in support of the assignments of error and that the judgment and sentence should be and it is hereby affirmed.

BRETT, P. J., and BUSSEY, J., concur.